**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HEIDI TULLER, individually and on behalf of all others similarly situated, | Case No.   1:23-cv-349 |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| WARREN GENERAL HOSPITAL, | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff Heidi Tuller ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through undersigned counsel, brings this Class Action Complaint against Defendant Warren General Hospital ("WGH" or "Defendant"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

**INTRODUCTION**

1.      Plaintiff brings this class action against WGH for its failure to secure and safeguard Plaintiff's and approximately 169,000 other individuals' personally identifiable information ("PII") and personal health information ("PHI") (collectively, "PII/PHI"), including, but not limited to: names, addresses, dates of birth, Social Security numbers, financial account information, payment card information, health insurance claims information, and medical information including diagnosis, medications, lab results, and other treatment information.

2.      Defendant is a Pennsylvania-based hospital that offers "a wide range of medical services, including emergency care, surgery, rehabilitation, and specialized treatments[]" to its

1

patients.[1]

3.     According to the "Notice of Data Privacy Event"[2] published on WGH's website, on September 24, 2023, Defendant "identified suspicious activity on [its] network."[3] In response, Defendant "launched an investigation into the nature and scope of the activity with the assistance of industry leading cybersecurity specialists."[4]

4.     WGH's investigation revealed that "an unknown actor accessed certain computer systems in [its] network between September 15, 2023 and September 23, 2023, and downloaded certain information from [its] network" (the "Data Breach").[5]

5.     WGH owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. WGH breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their patients' PII/PHI from unauthorized access and disclosure.

6.     As a result of WGH's inadequate security measures and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all other individuals whose PII/PHI was exposed as a result of the Data Breach.

---

[1] *About,* WARREN GENERAL HOSPITAL, https://www.wgh.org/about (last accessed December 6, 2023).
[2] *Notice of Data Privacy Event*, WARREN GENERAL HOSPITAL, https://www.wgh.org/data (last accessed December 6, 2023).
[3] 2023-11-17 Warren General Hospital Data Breach Notice to Consumers, OFFICE OF THE VERMONT ATTORNEY GENERAL, available at https://ago.vermont.gov/document/2023-11-17-warren-general-hospital-data-breach-notice-consumers (last accessed December 6, 2023).
[4] *Id.*
[5] *Id.*

7.      Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. Plaintiff seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

**PARTIES**

*Plaintiff*

8.      Plaintiff Heidi Tuller is and has been, at all relevant times, a resident and citizen of Warren, Pennsylvania. Ms. Tuller has been a patient at WGH for many years and has paid for and received medical services numerous times from WGH. Ms. Tuller provided her PII/PHI to WGH, or otherwise had her PII/PHI provided to WGH, in connection with receiving medical services from it. In or around November 17, 2023, Ms. Tuller received a letter from WGH notifying her that her PII/PHI may have been exposed in the Data Breach.

*Defendant*

9.      Defendant Warren General Hospital is a corporation formed under the state laws of Pennsylvania, with its principal place of business located at 2 Crescent Park West, Warren, Pennsylvania 16365.

**JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than

Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

11.    This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District.

12.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendant's principal place of business is located in this District; Defendant maintains Class members' PII/PHI in this District; and Defendant caused harm to Class members residing in this District.

## FACTUAL ALLEGATIONS

### *Overview of Warren General Hospital*

13.    Warren General Hospital is a Pennsylvania-based hospital that offers "a wide range of medical services, including emergency care, surgery, rehabilitation, and specialized treatments[]" to its patients.[6] WGH touts itself as "the best hospital in the area due to its exceptional medical care and patient-centered approach."[7] WGH also "boasts state-of-the-art facilities and equipment, staffed by highly skilled and compassionate medical professionals."

14.    In the regular course of its business, WGH collects and maintains the PII/PHI of its patients, former patients, and other individuals to whom it is currently providing or previously provided medical and/or health-related services.

15.    WGH requires patients to provide sensitive personal information prior to providing medical and/or health-related services. Upon information and belief, that information includes, *inter alia*, names, addresses, dates of birth, Social Security numbers, financial account information,

---

[6] *See* https://www.wgh.org/about (last accessed December 6, 2023).
[7] *Id.*

payment card information, health insurance claims information, and medical information including diagnosis, medications, lab results, and other treatment information. WGH stores this information digitally.

16.    WGH provides on its website a "Patient's Rights, Responsibilities, and Privacy Notice" which states, in pertinent part, that patients have the right to "[p]rivacy concerning your own medical care. Case discussion, consultation, examination, and treatment should be done in places designed to protect your privacy."[8]

17.    Upon information and belief, WGH also provides every patient with a HIPAA compliant disclosure form in which it represents that it will protect patients' PII/PHI.

18.    Plaintiff and Class members are, or were, patients of WGH, and/or received medical and/or health-related services from WGH, and entrusted WGH with their PII/PHI.

19.    Plaintiff and Class members, as former and current patients of WGH, relied on these promises and on this well-established healthcare entity to keep their sensitive PII/PHI confidential and securely maintained, to use this information for business purposes only, and to make certain only authorized disclosure of this information.

### The Data Breach

20.    In November 2023, WGH published a "Notice of Data Privacy Event" on its website after an unauthorized third party accessed certain computer systems in WGH's network. In its Notice, WGH explains:

> **What Happened?** On September 24, 2023, WGH identified suspicious activity on our network. We immediately took steps to secure our systems and launched an investigation into the nature and scope of the activity with the assistance of industry leading cybersecurity specialists. We also promptly reported the event to federal law enforcement. The investigation determined that an unknown actor accessed certain computer systems in our network between September 15, 2023, and

---

[8] https://www.wgh.org/patients-rights-respon-and-privacy.

September 23, 2023, and downloaded certain information from our network. In response, we undertook a comprehensive review of our internal records to determine what information was present on the affected systems and identified contact information to provide notification to potentially impacted individuals. We recently completed this review.

**What Information Was Involved?** The type of information that may have been present on the impacted systems includes name, address, date of birth, Social Security number, financial account information, payment card information, health insurance claims information, and medical information including diagnosis, medications, lab results, and other treatment information.[9]

21.     WGH provides scant detail about the Data Breach and the steps that WGH is taking to address it. WGH's Notice does not provide the dates of Defendant's investigation, details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class members, who retain a vested interest in ensuring that their PII/PHI remain protected.

22.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class members of the Data Breach's critical facts. Without these details, Plaintiff's and Class members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

23.     WGH failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of PII/PHI, such as encrypting the information or deleting it when it is no longer needed.

24.     The attacker accessed and acquired files in WGH's computer systems containing unencrypted PII/PHI of Plaintiff and Class members, including their names, addresses, dates of

---

[9] *See Notice of Data Privacy Event*, n.2, *supra*.

birth, Social Security numbers, financial account information, payment card information, health insurance claims information, and medical information including diagnosis, medications, lab results, and other treatment information. Plaintiff's and Class members' PII/PHI was accessed and stolen in the Data Breach.

25.    As evidenced by the Data Breach's occurrence, the PII/PHI contained in WGH's system was not adequately protected from intrusions. Had the information been properly secured consistent with industry standard and best practices, the data thieves would have exfiltrated only unintelligible data.

### WGH Knew That Criminals Target PII/PHI

26.    At all relevant times, WGH knew, or should have known, its patients', Plaintiff's, and all other Class members' PII/PHI was a target for malicious actors. Despite such knowledge, WGH failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that WGH should have anticipated and guarded against.

27.    It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as Social Security numbers ("SSNs") and medical information—is valuable and frequently targeted by criminals. Indeed, "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

28.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2021 report, the healthcare compliance company Protenus found that there were

---

[10]    Dennis Green, et al., *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

758 medical data breaches in 2020 with over 40 million patient records exposed.[11] This is an increase from the 572 medical data breaches that Protenus compiled in 2019.[12]

29.    PII/PHI is a valuable property right.[13] The value of PII/PHI as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies spend many billions of dollars on acquiring personal data of consumers.[16] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

30.    As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

---

[11]    Protenus, *2021 Breach Barometer*, PROTENUS.COM, available at https://www.protenus.com/resources/2021-breach-barometer (last accessed Dec. 6, 2023).
[12]    Protenus, *2020 Breach Barometer*, PROTENUS.COM, available at https://www.protenus.com/resources/2020-breach-barometer (last accessed Dec. 6, 2023).
[13]    *See* Marc van Lieshout, *The Value of Personal Data*, IFIP Advances in Information and Communication Technology. 457. 26-38 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), available at https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.
[14]    *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.
[15]    OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD LIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.
[16]    IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (estimated to have spent over $19 billion in 2018).

31.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[17] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[18] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[19]

32.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[20] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[21]

33.    John Riggi, the American Hospital Association National Advisor for Cybersecurity and Risk, said "foreign cyber gangs and spies" were testing the resilience of hospitals especially

---

[17]    *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[18]    *Id.*

[19]    *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[20]    SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last accessed Dec. 6, 2023).

[21]    Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last accessed Dec. 6, 2023).

as hospitals began to fill up at the time because of the "tripledemic" including increased cases of RSV, flu and COVID-19.[22]

34.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[23] Quoting Carbon Black's Chief Cybersecurity Officer, one article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[24]

35.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[25]

36.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[22] Dan Alexander, *Personal Data of 617,000 Patients Exposed in NJ Hospital Cyberattack*, NEW JERSEY 101.5 (Feb. 13, 2023), https://nj1015.com/personal-data-of-617000-patients-exposed-in-nj-hospital-cyberattack/.
[23]    *What Happens to Stolen Healthcare Data*, *supra* at n. 17.
[24]    *Id.*
[25]    Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

37.     Theft of PII/PHI is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[26]

38.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[27] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[28]

39.     With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the

---

[26]    *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Dec. 6, 2023).

[27]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[28]    *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

victim's name and SSN to obtain government benefits, or; filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[29]

40.     Identity theft is a very difficult problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[30]

41.     Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. To obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

42.     Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[31]

---

[29]   *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Dec. 6, 2023).
[30]   Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Dec. 6, 2023).
[31]   Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

43.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[32] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[33] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[34] The FTC also warns, "If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[35]

44.     For these reasons, the information compromised in the Data Breach is significantly more valuable than the loss of basic financial information, because there, victims can cancel or close credit or debit card accounts. Upon information and belief, the information compromised by the Data Breach—for example, a Social Security number—is exceedingly difficult, if not impossible, to change.

45.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

---

[32]    Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf.
[33]    *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* at n.21.
[34]    *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Dec. 6, 2023).
[35]    *Id.*

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[36]

46.     There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[37]

47.     It is within this context that Plaintiff and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

---

[36]  *See The Geography of Medical Identity Theft*, *supra* at n.32.
[37]  John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

*WGH Fails to Comply with Industry Standards*

48.    Cyber security experts routinely identify healthcare entities in possession of PII/PHI as being particularly vulnerable to cyberattacks because of the value of the information which they collect and maintain.

49.    As a result, several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of PII/PHI, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

50.    WGH failed to follow, enforce, or maintain the aforementioned best practices. McClaren also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

*Damages Sustained by Plaintiff and Class Members*

51.    Plaintiff and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv)

deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

52.     Plaintiff had a reasonable expectation of privacy in her sensitive PII/PHI while receiving medical services. Plaintiff would not have agreed to have her sensitive PII/PHI provided to and maintained by WGH had she known that WGH would fail to adequately protect their PII/PHI. Indeed, Plaintiff sought medical care through WGH with the reasonable expectation that WGH would keep her PII/PHI secure and inaccessible to unauthorized parties. Plaintiff and Class members would not have obtained services from WGH had they known that WGH failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their PII/PHI from criminal theft and misuse.

53.     Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

54.     As a result of WGH's failures, Plaintiff and Class members are also at substantial and certainly impending increased risk of suffering identity theft and fraud or misuse of their PII/PHI. Indeed, Plaintiff's damages are not merely speculative. Consequently, Plaintiff and Class

members now face a substantially increased risk of identity and medical theft that is plausibly imminent, considering the actual instances of fraud already suffered by other Class members.

## **CLASS ALLEGATIONS**

55.     This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

56.     Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

**Nationwide Class**

All persons in the United States whose PII/PHI was accessed by and disclosed to unauthorized persons in the Data Breach, including all persons who were sent a notice of the Data Breach.

57.     Alternatively, Plaintiff seeks to certify this action on behalf of the following state class:

**Pennsylvania Class**

All persons in the Commonwealth of Pennsylvania whose PII/PHI was accessed by and disclosed to unauthorized persons in the Data Breach, including all persons who were sent a notice of the Data Breach.

58.     Excluded from the Class are WGH and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

59.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

60.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

61.    The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. WGH reported that approximately 168,921 individuals' information was exposed in the Data Breach.

62.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

    a.    Whether WGH had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

    b.    Whether WGH failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

    c.    Whether an implied contract existed between Class members and WGH providing that WGH would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

    d.    Whether WGH breached its duties to protect Plaintiff's and Class member's PII/PHI; and

    e.    Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

63.    WGH engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

64.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by WGH, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

65.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that Plaintiff has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

66.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against WGH, so it would be impracticable for Class members to individually seek redress from WGH's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
## NEGLIGENCE

67.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully

set forth herein.

68.    WGH owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

69.    WGH knew the risks of collecting and storing Plaintiff's and Class members' PII/PHI and the importance of maintaining secure systems. WGH knew of the many data breaches that targeted businesses that collect sensitive PII/PHI in recent years.

70.    Given the nature of WGH's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, WGH should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

71.    WGH breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

72.    It was reasonably foreseeable to WGH that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

73.    But for WGH's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

74.    WGH's duties also arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for

Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

75.    WGH's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as WGH, of failing to employ reasonable measures to protect and secure PII/PHI.

76.    WGH violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and Class members' PII/PHI and not complying with applicable industry standards. WGH's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

77.    WGH violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI and not complying with applicable industry standards. WGH's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

78.    In addition to its negligence, WGH's violation of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

79.    Plaintiff and Class members are within the class of persons that HIPAA Privacy

and Security Rules and Section 5 of the FTCA were intended to protect.

80.     The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and all other Class members as a result of the Data Breach.

81.     It was reasonably foreseeable to WGH that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

82.     As a result of WGH's above-described wrongful actions, inaction, and want of ordinary care, and its negligence and negligence per se, that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) the continued risk to their PII/PHI which remains in WGH's possession; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased

risks of medical identity theft they face and will continue to face. In addition, Class members already have suffered actual fraud, identity theft, and medical theft as alleged herein, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class members.

## COUNT II
## BREACH OF FIDUCIARY DUTY

83.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84.     Plaintiff and Class members provided WGH their PII/PHI in confidence, believing that WGH would protect that information. Plaintiff and Class members would not have provided WGH with this information had they known it would not be adequately protected. WGH's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between WGH, on the one hand, and Plaintiff and Class members, on the other hand. In light of this relationship, WGH must act primarily for the benefit of their patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

85.     WGH has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. WGH breached that duty by failing to properly protect the integrity of their systems containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that they collected.

86.     As a direct and proximate result of WGH's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and

recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in WGH's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach. In addition, upon information and belief, Class members already have suffered actual fraud, identity theft, and medical theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class members.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

87.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88.    In connection with receiving medical treatment, and/or health-related services Plaintiff and Class members entered into implied contracts with WGH.

89.    Pursuant to these implied contracts, Plaintiff and Class members provided WGH with their PII/PHI. In exchange, WGH agreed to, among other things, among other things, and Plaintiff understood that WGH would: (1) provide medical treatment and/or health-related services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

90.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and WGH, on the other hand. Indeed, as set forth *supra*, WGH recognized the importance of data security and the privacy of its patients' PII/PHI in, *inter alia*, its HIPAA Privacy Practices. Had Plaintiff and Class members known that WGH

would not adequately protect their patients' PII/PHI, they would not have received medical treatment or services from WGH.

91.     Plaintiff and Class members performed their obligations under the implied contract when they provided WGH with their PII/PHI and paid—directly or through their insurers—for health care treatment, services, or health insurance premiums from Defendant.

92.     WGH breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

93.     WGH's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and Class members have suffered from the Data Breach.

94.     Plaintiff and Class members were damaged by WGH's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT

95.     Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

96.     This claim is pleaded in the alternative to the breach of implied contract claim.

97.     Plaintiff and Class members conferred a monetary benefit upon WGH in the form of monies paid for healthcare services or health insurance premiums.

98.     WGH accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. WGH also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this information was used facilitate payment and make insurance claims.

99.     As a result of WGH's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff's and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

100.     WGH should not be permitted to retain the money belonging to Plaintiff and Class members because WGH failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

101.     WGH should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

<u>COUNT V</u>
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW,
73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq*.**

102.    Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

103.    This claim is brought on behalf of Plaintiff and the Pennsylvania state class.

104.    Defendant is a "person", as meant by 73 Pa. Cons. Stat. § 201-2(2).

105.    Plaintiff and Pennsylvania class members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

106.    WGH engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including:

        a.    Representing that its goods and services have characteristics, uses, benefits, and qualities that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

        b.    Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201-2(4)(vii)); and

        c.    Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

107.    WGH's unfair or deceptive acts and practices include:

        a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Pennsylvania class members' PII/PHI, which was a direct and proximate cause of the Data Breach;

        b.    Failing to identify foreseeable security and privacy risks, remediate

identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Pennsylvania class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA;

d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Pennsylvania class members' PII/PHI, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Pennsylvania class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Pennsylvania class members' PII/PHI; and

g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Pennsylvania class members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA.

108.   WGH's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of consumers' PII/PHI.

109.    WGH intended to mislead Plaintiff and Pennsylvania class members and induce them to rely on their misrepresentations and omissions.

110.    Had Defendant disclosed to Plaintiff and Pennsylvania class members that WGH's data systems were not secure and, thus, vulnerable to attack, they would not have used WGH's services and agreed to provide WGH with their PII/PHI and WGH would have been unable to continue in business. Instead, Defendant received, maintained, and compiled Plaintiff's and Pennsylvania class members' PII/PHI as part of the services they provided without advising Plaintiff and Pennsylvania class members that WGH's data security practices were insufficient to maintain the safety and confidentiality of their PII/PHI. Accordingly, Plaintiff and Pennsylvania class members acted reasonably in relying on WGH's misrepresentations and omissions, the truth of which they could not have discovered.

111.    Defendant acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff and Pennsylvania class members' rights.

112.    As a direct and proximate result of WGH's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and Pennsylvania class members' reliance on them, Plaintiff and Pennsylvania class members have suffered and will continue to suffer injury and actual harm in the form of, *inter alia*: (a) the compromise, publication, theft, and/or unauthorized use of their PII and PHI; (b) out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft and fraud; (c) lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft

and fraud; (d) the continued risk to their PII and PHI, which remains in the possession of WGH and is subject to further breaches so long as WGH fails to undertake appropriate measures to protect PII and PHI in its possession; and (e) current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Pennsylvania class members.

113.    Plaintiff and Pennsylvania class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, restitution, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against WGH as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of themselves and the Class, seeks appropriate injunctive relief designed to prevent WGH from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the

maximum extent allowable;

     E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as

allowable; and

     F.     Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## **JURY TRIAL DEMANDED**

     Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: December 6, 2023

     */s/ Andrew W. Ferich*

     Andrew W. Ferich (PA 313696)

     **AHDOOT & WOLFSON, PC**

     201 King of Prussia Road, Suite 650

     Radnor, PA 19087

     Tel: (310) 474-9111

     Fax: (310) 474-8585

     aferich@ahdootwolfson.com

     Tina Wolfson*

     **AHDOOT & WOLFSON, PC**

     2600 W. Olive Ave., Suite 500

     Burbank, CA 91505

     Tel: (310) 474-9111

     Fax: (310) 474-8585

     twolfson@ahdootwolfson.com

     **Pro Hac Vice* application forthcoming

     *Counsel for Plaintiff and the Proposed Class*